UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOHN M. ZURAWSKI,                )
                                 )
            Plaintiff            )
                                 )
      v.                         )  CAUSE NO: 2:10-cv-159
                                 )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
            Defendant            )

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, John M. Zurawski, on December 10, 2010. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

Background

The plaintiff, John Zurawski, filed an application for Disability Insurance Benefits and Supplemental Security Income on September 28, 2006, alleging disability beginning August 1, 2005, due to knee problems, shoulder problems, and blindness in his left eye. (Tr. 118-120, 131-133, 139) His claim initially was denied on January 5, 2007, and again denied upon reconsideration on May 21, 2007. (Tr. 76-78, 86-88) On June 5, 2007, Zurawski filed a written request for a hearing before an Administrative Law Judge. (Tr. 11) A hearing before ALJ Dennis Kramer was held

on October 10, 2008, at which Zurawski and vocational expert William Schweihs [Sweitz] testified.  (Tr. 11) Although informed of the right to representation, Zurawski chose to appear and testify without the assistance of an attorney.  (Tr. 11)

On November 20, 2008, the ALJ issued his decision denying benefits.  The ALJ explained that Zurawski maintained the residual functional capacity to perform sedentary work and was not disabled.  (Tr. 11-18) Following the denial of Zurawski's request for review by the Appeals Council, he filed his complaint with this court.

Zurawski was born in September of 1961, making him 47 years old at the time of the ALJ's decision.  (Tr. 28, 57) He was 5'6" in height and weighed approximately 179 pounds.  (Tr. 15)  Zurawski was single with no children and resided by himself.  (Tr. 29) He completed the requirements for his General Educational Development certification and last worked as an automobile mechanic. (Tr. 14) Zurawski was laid off from his position as an auto mechanic approximately one year before the alleged onset of his disability.  (Tr. 30) He received food stamps, and after being laid off, he began metal scrapping.  (Tr. 31) Metal scrapping gave Zurawski a monthly income of roughly $200.00, and he continued to scrap for six months.  Zurawski has not been employed since being laid off as a mechanic.  (Tr. 31)

Zurawski did not submit any evidence of medical treatment for any condition and admitted at the hearing that he had not sought or received medical treatment in years.  (Tr. 35) The only evidence of record is that developed by the agency in assessing Zurawski's claims of disability.  (Tr. 35) In November 2006, Zurawski was examined by Dr. Oranu Ibekie at the request of the agency.  (Tr. 174-177) Zurawski reported to Dr. Ibekie that he had long-standing problems involving his right hip, left knee, and left eye.  (Tr. 174) He also alleged difficulty walking, lifting, pushing, pulling, and seeing.  (Tr. 174) He complained of pain in his lower back, right hip, and left knee, but denied any weakness.  (Tr. 175)  Zurawski also denied stress or depression.  (Tr. 175) Zurawski could bear weight on either leg but favored the right. His range of motion was decreased in the right hip and left knee but there was no joint swelling, stiffness, or tenderness.  (Tr. 176)  Dr. Ibekie noted that Zurawski's ability to lift and carry could be done with difficulty.  (Tr. 177)  He had no difficulty with handling objects or fine manipulation, and he had no limitations of memory, comprehension, sustained concentration, or social interaction.  (Tr. 177)

In January 2007, a state agency psychologist reviewed the record and determined that Zurawski did not have a medically determinable mental impairment.  (Tr. 180) Two state agency

physicians also reviewed the record in January 2007, and both agreed Zurawski could perform light exertional work with occasional postural movements.  (Tr. 195-202)

In May 2007, Zurawski had a second consultative examination with Dr. Teofilo Bautista.  (Tr. 203-205)  In this examination, Zurawski alleged problems with both knees, vision problems, and problems with his shoulders.  (Tr. 203) Dr. Bautista noted that Zurawski was blind in his left eye, walked with a slight limp due to left knee pain, and used a cane in the right hand for support.  (Tr. 204)  Upon examination, Zurawski was able to walk without his cane and had a slight left-sided limp.  (Tr. 203) He had only mild pain and tenderness in his lower back but refused range of motion testing due to back and hip pain.  (Tr. 203-04) Zurawski's left knee showed mild tenderness and moderately reduced range of motion, and his range of motion was reduced in both shoulders. (Tr. 204) He showed good muscle tone and strength without atrophy and good grip strength with normal finger manipulation.  (Tr. 205) Zurawski refused reflex testing in the left knee due to allegations of pain.  (Tr. 205)  He also refused to allow Romberg testing[1] due to complaints of dizzy spells.  (Tr. 205)

---

[1] The Romberg Test is a neurological test to detect poor balance. "[W]ith feet approximated, the subject stands with eyes open and then closed; if closing the eyes increases the unsteadiness, a loss of proprioceptive control is indicated, and the sign is positive." *Stedman's Medical Dictionary* 373770 (27th ed. 2000).

A third state agency official reviewed the record in May 2007, and affirmed the opinions of the previous state agency experts that Zurawski could perform light work.  (Tr. 207)

At the hearing before the ALJ, Zurawski testified that he had been laid off sometime around early 2004 and began doing some self-employment type work but stopped because he "started falling in his truck and breaking ribs."  (Tr. 30) He stated that he could drive a car and use public transportation but could not walk one block.  (Tr. 38) He had a boy that did his shopping for him because he could not walk around the store.  (Tr. 39) He had someone who mowed the lawn, cleaned certain areas of his mobile home, and helped with the rent.  (Tr. 53) Zurawski was able to go to the laundromat and do his own laundry.  (Tr. 53)

Zurawski further testified that he had been using a cane that was not prescribed by a doctor for a year because his left knee popped out of place two or three times a day, at which point he could not put any pressure on it and had to straighten it out and wiggle it around to get it to pop back into place.  (Tr. 35) He used the cane approximately 60 percent of the time he was in his trailer.  (Tr. 37) His right hip gave him a lot of pain and trouble in the morning where he received a gunshot wound 15 to 18 years earlier.  (Tr. 37, 46) He could walk half a block without the cane, but if he did, his hip would give out and he would have

5

pain in both knees.  (Tr. 39-40) He could not climb ladders and could climb three to four steps very slowly.  (Tr. 40) Zurawski stated that he had extreme pain, ten on a one to ten scale, in his right hip for at least an hour every morning.  (Tr. 40-41) He sometimes took Aleve, Ibuprofen, or pain pills from friends when he could get them.  (Tr. 41)

Zurawski continued to testify that he had been completely blind in the left eye for 15 to 20 years and no longer could read fine print, but he had no difficulty driving.  (Tr. 42-43) He stated he had high blood pressure and could not reach his arms above his head.  (Tr. 44-45) He kept all his canned goods on lower shelves so he could reach them, and he only had pain in his arms when he reached above his head, not with normal usage.  (Tr. 46)

During an eight hour day he sat most of the time. (Tr. 49) When he laid in bed, Zurawski elevated his legs with two pillows. (Tr. 49)  He could stand for a maximum of 15 minutes with or without the cane, and then had to sit down for a half hour to 45 minutes.  (Tr. 49) He did not believe that he could lift or carry anything.  (Tr. 50) He also testified that he could  not kneel or squat and did not want to try bending over and touching his toes. (Tr. 50-51) He said that he had been feeling highly depressed lately and experienced hot flashes but was not treated for these

symptoms.  (Tr. 51-52) He slept for three to four hours at a time
before he got up to move around and could not sleep straight
through the night.  (Tr. 52) He also testified to having low
energy, loss of concentration, slight panic attacks, and feelings
of vertigo.  (Tr. 52)

Vocational Expert William Sweitz was last to testify.  (Tr.
54) The ALJ posed a series of hypothetical questions.  (Tr. 58)
First, the ALJ asked the VE about Zurawski's ability to perform
his past work, any work with transferable skills, or any work,
when he had taken into account Zurawski's age, GED, and assuming
Zurawski occasionally could lift and carry 20 pounds, frequently
lift and carry ten pounds, stand or walk with normal breaks for
six hours in an eight hour workday, sit for approximately six
hours in an eight hour work day, and occasionally climb stairs,
balance, stoop, kneel, crouch, or crawl.  (Tr. 58, 194-201) The
VE responded that Zurawski could not perform his past work as an
auto mechanic but that there were transferable skills to low end
semi-skilled jobs, such as an oil change technician, which is at
the light exertion level.  (Tr. 58-59)

The ALJ's second hypothetical took the same factors and
limitations as hypothetical one, and added that Zurawski could
carry items but with difficulty, also noting left eye blindness,
and significant limitations in sitting, standing, and walking due

7

to lower back pain.  (Tr. 60) The VE responded by saying this would reduce light work and eliminate the oil change position. (Tr. 61) The VE stated that Zurawski would be limited to sedentary to light work, such as information clerk (3,000 jobs), gate guard (3,000 or more jobs), lobby attendant (1,500-2,000 jobs), cashier (3,000 jobs), or telemarketer (3,000 jobs).  (Tr. 61-62)

The third hypothetical the ALJ posed took the factors and limitations in hypotheticals one and two, and added the limitations of using a cane held in his left hand, although he was right handed.  (Tr. 63) The VE responded by saying it would eliminate his past work and some light exertion positions, specifically the lobby attendant positions.  (Tr. 63) He noted this would cause less than a five percent reduction in the other positions at the sedentary level.  (Tr. 63)

Hypothetical four took all of the limitations and factors in hypotheticals one, two, and three and added that Zurawski had decreased vision, specifically left eye blindness and 20/30 in the right eye.  (Tr. 63) The VE noted that this would not significantly reduce the positions.  (Tr. 63-64)

Hypothetical five added to the previous hypotheticals that Zurawski's left knee would pop out of place two or three times a day and then he would have to straighten out the knee and pop it back in, which took roughly half a minute, or he could possibly

8

fall down.  (Tr. 64-65) The VE responded by saying that this would eliminate all jobs because no workplace in a competitive environment would accommodate that.  (Tr. 65)

Hypothetical six added to hypotheticals one through four (all factors and limitations except the left knee popping out) that Zurawski's hip, if walking more than a block, would give out and then he would fall down and could not stand for the next five to eight hours.  (Tr. 67) The VE answered by saying it would again rule out any full-time competitive work.  (Tr. 68)

Hypothetical seven took Zurawski's residual functional capacity, age, education, and past work.  The ALJ excluded the need to lie down and the leg or knee collapsing and assumed an individual who could walk 15 minutes with or without a cane, then he had to sit down for 45 minutes to avoid having his knee or hip problems.  (Tr. 68) This hypothetical also took into account that he could sit one-half hour to 45 minutes, and then stand for 15 minutes, occasionally lift and carry ten pounds, no frequent lifting, could not climb ladders, could not kneel, could not squat, could not bend to touch his toes, could not reach his arms above his head, and could climb three to four stairs.  (Tr. 68-69) With those limitations, the ALJ asked the VE if Zurawski would be able to perform his past work, any work with transfer-able skills, or any work.  (Tr. 69) The VE stated that he still

9

would be able to perform unskilled sedentary work such as cash-
ier, telemarketer, information clerk, gate guard, and lobby
attendant.  (Tr. 69-70) He also noted that the use of the cane
for standing would reduce the cashier and telemarketer positions
by at least two-thirds, the lobby attendant by 50 to 60 percent,
and the gate guard and information clerk by about a third.  (Tr.
70)

Hypothetical eight proposed that Zurawski would have to lay
down twice for one-half hour to 45 minutes during an eight hour
work day.  (Tr. 70) The VE responded that this would eliminate
all full-time competitive jobs.  (Tr. 70)

In his decision, the ALJ discussed the five-step sequential
evaluation process for determining whether an individual was
disabled.  (Tr. 12-13) In step one, the ALJ found that Zurawski
had not engaged in substantial gainful activity since August 1,
2005, his alleged onset date.  At step two, the ALJ found that
Zurawski had the following severe impairments: loss of vision in
the left eye, hypertension, and degenerative joint disease.  At
step three, the ALJ found that Zurawski's impairments did not
meet or medically equal one of the listed impairments.  (Tr. 13)

In determining Zurawski's residual functional capacity, the
ALJ adopted the assessment offered by the state agency medical
advisers and stated that Zurawski's allegations were not found to

be credible due to the lack of medical corroboration and his refusal to cooperate with testing.  (Tr. 16) The ALJ found that the evidence in the record did not show the existence of a medically determinable impairment that reasonably could be expected to cause the degree of limitations Zurawski alleged.  (Tr. 16) The ALJ found that Zurawski retained the capacity to perform sedentary work that involved no more than occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and due to blindness in the left eye, he was unable to perform jobs that required bilateral visual acuity.  (Tr. 16) The ALJ noted that state agency medical advisers found Zurawski could sit or stand for a total of about six of eight hours in a typical workday. (Tr. 15)

In reaching this determination, the ALJ first discussed Zurawski's testimony of his physical capabilities.  (Tr. 14) He then summarized the findings of Dr. Ibekie, who noted Zurawski was blind in the left eye, that sitting, walking, and standing could be done with significant limitation due to back and knee pain, lifting and carrying could be done with difficulty, and fine finger activities and gross hand activities could be done without limitation.  (Tr. 15) The ALJ then discussed the findings of the second physician, Dr. Bautista, who noted that Zurawski refused range of motion testing of the spine or hips due to alle-

11

gations of pain.  (Tr. 15) He also refused Romberg testing and refused to attempt to do tandem, heel, and toe walking.  (Tr. 15-16) Dr. Bautista's diagnostic impressions included hypertension, degenerative joint disease of the left hip and knee, chronic low back pain due to degenerative joint disease, blindness in the left eye, a history of a gunshot wound to the right thigh, and bilateral shoulder pain with decreased range of motion due to degenerative joint disease.  (Tr. 16) The ALJ adopted the findings of the state agency physicians and found that the physical examinations of Zurawski did not reveal objective signs that would show the presence of a condition that would interfere with his ability to perform at least sedentary work.  (Tr. 16)

With the RFC determined, at step four the ALJ found Zurawski could not perform his past relevant work.  (Tr. 16) At step five, the ALJ found that considering Zurawski's age, education, work experience, and RFC, there were a significant number of jobs available in the national economy, including gate guard (3,000 jobs), telemarketer (1,500-2,000 jobs), and information clerk (3,000 jobs).  (Tr. 16-17)

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings

12

are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental im-

pairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability.  20 C.F.R. §404.1520, §416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §404.1520(b), §416.920(b).  If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §404.1520(c), §416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work.  If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. §404.1520(e), §416.920(e).

14

However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f), §416.920(f).

Zurawski raises four issues in his request for reversal of the ALJ's decision: whether the ALJ failed to develop the record; whether the ALJ improperly assessed Zurawski's credibility under SSR 96-7p; whether the ALJ improperly evaluated Zurawski's RFC under SSR 96-8p; and whether the ALJ's hypothetical questions to the VE failed to account for all of Mr. Zurawski's limitations.

The ALJ has a "basic obligation" to develop a full and fair record. ***Thompson v. Sullivan***, 933 F.2d 581, 585 (7th Cir. 1991). This duty is heightened when the claimant proceeds *pro se.* ***Martin v. Astrue***, 345 Fed. Appx. 197, 201-02 (7th Cir. 2009). Under such circumstances, the ALJ is expected to make a significant and concerted effort to expound the claimant's medical history and ongoing impairments by asking specific questions about his treatment, symptoms, and day-to-day activities.  *See* ***Luna v. Shalala***, 22 F.3d 687, 692-93 (7th Cir. 1994) (holding that the ALJ sufficiently developed the record by probing all relevant

15

issues, extensively questioning the claimant about his pain, medication, and activities, and the reviewing available medical records).

Zurawski first alleges that the ALJ failed to comply with his obligation to develop the record because he did not explore and consider the reasons Zurawski refused to cooperate with Dr. Bautista's range of motion testing in his hips and spine, tandem heel and toe walking tests, Romberg tests, and reflex testing in his left knee. A claimant's refusal to cooperate may be a sufficient reason to reject the claimant's testimony. *Goble v. Astrue*, 385 Fed. Appx. 588, 591 (7th Cir. 2010) (*citing Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)). However, the ALJ may not draw any inferences from the claimant's refusal to cooperate until he has explored the reasons why the claimant refused to comply. *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). The ALJ must take the claimant's complaints of pain into consideration when assigning weight to his refusal to cooperate.

As a preliminary matter, the ALJ relied more heavily on the lack of corroborating medical evidence than Zurawski's refusal to cooperate. *See Krontz v. Barnhart*, 2002 WL 32072796, *9 (N.D. Ind. Mar. 26, 2002) (affirming the ALJ's decision where the plaintiff's failure to follow treatment was "simply an additional factor in the ALJ's credibility assessment" and the ALJ's credi-

16

bility assessment did not "rest" on it).  The majority of the
ALJ's discussion delved into the state agency physicians' review
of the medical record and the lack of any medically determinable
impairment that reasonably could be found to cause Zurawski's
subjective complaints.  However, the ALJ did make note of Zuraw-
ski's refusal to cooperate with the testing and therefore was
required to consider Zurawski's justifications.  Contrary to
Zurawski's contentions, the record reflects that the ALJ made the
necessary inquiry.  The ALJ probed into Zurawski's reasons for
failing to comply and noted his explanation in his decision.  The
ALJ explained that Zurawski fully complied with the first state
physician, but refused certain tests suggested by the second
state physician because he was experiencing pain and dizzy
spells.  Regardless of his reasons, the medical evidence did not
corroborate Zurawski's complaints of pain or his justification
for refusing the testing.  This is particularly true because
Zurawski previously was capable of complying with the same tests
administered by the first state agency physician.  Because the
ALJ noted Zurawski's explanation and fully explained the evidence
contrary to these allegations, the record reflects that the ALJ
sufficiently considered Zurawski's reasons for refusing to co-
operate and rejected his explanations as inconsistent with the
objective medical evidence of record.

17

Zurawski next alleges that in developing the record, the ALJ should have, but failed to consider the reasons for Zurawski's lack of medical treatment to corroborate his allegations.  In assessing credibility, the ALJ should consider the treatment the claimant received, any remedies he applied to relieve the pain or other symptoms, and the absence thereof.  SSR 96-7p.  The failure to obtain treatment can support an adverse credibility finding where the claimant did not have a sufficient justification for failing to seek treatment.  *Craft*, 539 F.3d at 679.  Before drawing a negative inference from a claimant's lack of treatment, the ALJ must consider the claimant's explanation for failing to seek treatment.  *Craft*, 539 F.3d at 679 (explaining that the inability to pay constitutes a sufficient justification for failing to seek out medical treatment).

Zurawski alleges that the ALJ relied heavily on his failure to seek medical treatment independent from the state agency physicians.  However, the ALJ's opinion dealt more precisely with the absence of evidence corroborating Zurawski's complaints of pain, not the dearth of medical evidence.  *See* Tr. 16 ("The claimant's allegations are not found to credible due to the lack of medical *corroboration*").  Because the ALJ did not rely on or discuss the absence of independent medical records, the ALJ was not required to inquire into Zurawski's failure to seek out inde-

18

pendent treatment.  But even if he was, the record reflects that the ALJ gave adequate consideration to Zurawski's reasons for failing to seek out medical treatment.  At the hearing, the ALJ questioned Zurawski about his reasons for failing to seek independent medical treatment, and Zurawski responded that he could not afford health care.  Upon further questioning, Zurawski conceded that he had not sought out free treatment through the emergency room, nor did he provide any evidence of medical treatment for any of his long-standing impairments during the time he was employed and could afford health care. (Tr. 54)  Zurawski did not provide an explanation for these shortcomings, and the ALJ was entitled to take them into consideration.

Additionally, Zurawski contends that the ALJ should have ordered x-rays to make up for the lack of medical evidence and fully develop the record.  Although the ALJ has a duty to develop a full and fair record, this duty generally does not entail ordering additional examinations and tests unless "the medical records presented to [the ALJ] do not give sufficient medical evidence to determine whether the claimant is disabled." *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991).  *See also*, *Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000).  On review, the court must consider whether the ALJ could have assessed the claimant's dis-

19

abilities properly without the additional testing.  **Smith,** 231 F.3d at 437.

The ALJ did not believe, nor does this court, that the record was so devoid of evidence that additional testing needed to be ordered to determine whether Zurawski was disabled.  The state agency physicians examined Zurawski and noted that he had full muscle strength and tone and was able to walk without a cane.  Zurawski had a moderately reduced range of motion in his knee and both shoulders, no joint swelling, stiffness, or tender- ness, good grip strength, and normal finger manipulation.  Nei- ther of the state agency physicians considered impairments that might have been confirmed with an x-ray.  The ALJ was satisfied with the sufficiency of evidence before him and did not rely heavily on the absence of medical evidence.  As explained above, his decision was based on the absence of medical evidence corrob- orating Zurawski's complaints.

Furthermore, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *See* 20

20

C.F.R. §404.1567.  Zurawski stated that he had difficulty only with prolonged periods of standing and walking and that he spent most of the day sitting, but had to stretch once every 30 to 45 minutes.  Both state agency physicians concluded that Zurawski was capable of lifting 20 pounds, although the ALJ ultimately accounted for Zurawski's subjective complaints of pain, and determined that he could at least carry ten pounds.  As the court will explain below, this finding was consistent with the record as a whole.  These findings are consistent with the limitations imposed by sedentary work.  Therefore, it is not clear how an x-ray would change Zurawski's capabilities to show that he was unable to perform sedentary work.

The ALJ based his decision on medical examinations from the state agency physicians, their notes and results, as well as extensive testimony from Zurawski himself about his limitations. Since the medical records presented to the ALJ provided sufficient medical evidence and did not reflect any limitations that may have been confirmed with an x-ray, the ALJ had no duty to further develop the record in this regard.

Zurawski next argues that the ALJ did not consider or inquire about his daily activities.  The ALJ has a duty to act diligently and to inquire about all the facts and circumstances. *Thompson*, 933 F.2d at 586.  This is particularly true when the

claimant is not represented by counsel.  *See **Martin***, 345 Fed.
Appx. at 201-02.  However, the ALJ is not required to act as
counsel for the claimant.  ***Thompson***, 933 F.2d at 586.  Rather,
the court must assess whether the record reflects that the claim-
ant was not prejudiced by his lack of counsel.  ***Thompson***, 933
F.2d at 586 (*citing **Smith v. Schweiker***, 677 F.2d 826, 829 (11th
Cir. 1982)).  It must be clear that the ALJ engaged in more than
a superficial line of questioning and elicited both favorable and
unfavorable testimony.  ***Thompson***, 933 F.2d at 586.

At the hearing, the ALJ questioned Zurawski about his de-
pression, eating habits, drinking habits, sleeping habits, and
social life.  (Tr. 49-53) He also asked Zurawski about his abili-
ties to mow the lawn, clean his home, do his laundry, drive, go
to the bathroom, and go shopping for groceries.  (Tr. 37-38, 50-
54) Additionally, the ALJ went to great lengths to inquire into
all other aspects of Zurawski's life and his physical limita-
tions, such as his educational background, his work history, his
history of injuries, and medical history.  In making his deci-
sion, the ALJ conscientiously probed into and considered all of
the relevant facts, testimony, and medical evidence.

Zurawski criticizes the ALJ for failing to probe into what
he meant when Zurawski testified that he was limited in his
ability to clean the bathtub and did not question how his impair-

ments limited his ability to do laundry.  The ALJ did not explore Zurawski's fear of taking a shower because he believed he may fall, did not question to what extent his friend helped him grocery shop or perform other activities, and did not question how long he could drive a car or whether he experienced pain while driving.

The ALJ is not required to extensively probe into every piece of evidence of record.  *Diaz v. Chater*, 55 F.3d 300, 309 (7th Cir. 1995).  The ALJ is not the claimant's attorney and need not act as such.  *Thompson*, 933 F.2d at 586.  It is clear from the testimony that the ALJ considered Zurawski's limitations, questioned his abilities, and gave Zurawski an opportunity to explain his limited capabilities.  The ALJ did not limit his questioning to the evidence that was unfavorable to Zurawski. Rather, he questioned Zurawski about each of these abilities.  It is enough that the ALJ was aware that Zurawski required help to grocery shop and could clean, do laundry, and drive.  The ALJ also probed into Zurawski's other limitations, such as his inability to squat, lift, and kneel, limitations in standing and walking, and difficulty with his knee popping out.  These activities provided further insight into Zurawski's abilities.  It would be redundant to require the ALJ to probe specifically into these issues when Zurawski testified to limitations and the ALJ's

23

further line of questioning made the extent of Zurawski's limita-
tions apparent.

Zurawski also argues that the ALJ did not satisfy his duty
to develop the record because he failed to explore his current
complaints of depression.  The ALJ noted that Zurawski had been
feeling depressed lately, although he did not probe into how
often Zurawski felt depressed, the severity of his depression, or
the frequency of his panic attacks, hot flashes, or vertigo.  The
ALJ went on to discuss the objective medical evidence of record
and noted the lack of any medical evidence corroborating Zuraw-
ski's complaints of depression.  Zurawski also testified that he
was not seeking treatment or taking medication to deal with these
symptoms.  This weighs on the severity of the symptoms he testi-
fied as experiencing.  Because the ALJ may rely on the absence of
any corroborating objective medical evidence, and he adequately
explained the absence of evidence tending to support the com-
plaints of depression, the ALJ satisfied his duty to develop the
record.

In his final complaint of inadequate development of the
record, Zurawski contends that the ALJ failed to ask several key
questions to the VE, such as how the VE determined the number of
positions that would be reduced by the use of a cane, how signif-
icant limitations in sitting would affect the number of positions

24

available, and finally, how Zurawski's inability to lift his arms above shoulder level affected the number of positions available.

The ALJ may adopt the testimony of the VE provided it is consistent with the *Dictionary of Occupational Titles*.  20 C.F.R. §404.1566(d), (e); ***Earl v. Astrue***, 2008 WL 2078618, *11 (N.D. Ind. May 14, 2008).  The ALJ has an affirmative duty to question whether the VE's testimony is consistent with the DOT and to resolve any apparent discrepancies.  ***Overman v. Astrue***, 546 F.3d 456, 464 (7th Cir. 2008).  The ALJ may question the VE about the number of positions available that are consistent with the DOT and satisfy the hypothetical criteria the ALJ puts forth.  ***Crawford v. Astrue***, 633 F.Supp.2d 618, 636 (N.D. Ill. 2009).  The ALJ is not required to inquire as to the source of the VE's statistical data.  ***Crawford***, 633 F.Supp.2d at 637.  It is the duty of the claimant or his attorney to question the reliability of the statistics at the hearing.  ***Greenwood v. Barnhart***, 433 F.Supp.2d 915, 930 (N.D. Ill. 2006).  Even when the claimant proceeds pro se, the ALJ need not act as his attorney.  ***Thompson***, 933 F.2d at 586.  Rather, the ALJ satisfied his duty by questioning whether the VE's testimony was consistent with the DOT, and there was no indication of unreliability that required the ALJ to delve into further questioning.  *See e.g., **Greenwood***, 433 F.Supp.2d at 930 (explaining that the ALJ satisfied his duty by assuring that the

testimony was consistent with the DOT and only had to question the testimony when there were apparent conflicts).

At the hearing, the VE confirmed that his testimony was consistent with the DOT.  Zurawski did not question the reliability of the number of positions available at the hearing, nor does he contest their reliability now.  He only argues that the ALJ should have questioned the source of the VE's statistics.  However, it was not the ALJ's duty to inquire as to the source of the VE's statistics unless his testimony was apparently unreliable.  It was enough that the ALJ confirmed that the VE's testimony was consistent with the DOT.  Even so, Zurawski has not demonstrated how questioning the source of the testimony would change the outcome of his claim.  Zurawski is not contesting the reliability of the numbers and has not pointed the court to a reliable source that would have resulted in significantly lower availability and therefore affected the outcome of his claim. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (explaining that where it is clear that the ALJ's decision would not be overturned by remanding the issue for further consideration, the doctrine of harmless error applies to prevent remand).  For this reason, to the extent that the ALJ may have had a duty to inquire about the source of the VE's statistics, his error was harmless and does not demand remand.

Similarly, Zurawski contends that the ALJ should have asked the VE how "significant limitations in sitting" from Exhibit 1F would affect the number of positions available.  However, the ALJ specifically included this statement in his questioning of the VE on page 60 of the transcript. The VE replied that significant limitations in sitting and standing due to back pain, coupled with difficulty in lifting and carrying, would reduce the range of positions and rule out light work. (Tr. 60)

Zurawski also believes the ALJ should have included his inability to lift his arms above his shoulders in a hypothetical to the VE. The ALJ specifically addressed Zurawski's inability to raise his arms above his head in hypothetical seven. (Tr. 69) The VE responded by stating that Zurawski still would be able to perform the positions he recommended. (Tr. 69)  Therefore, the ALJ correctly included the necessary limitations and asked the appropriate hypothetical questions to the VE to develop a fair record.

The second issue Zurawski raises is whether the ALJ improperly assessed Zurawski's credibility under SSR 96-7p. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact

27

grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir. 1997); ***Allord v. Barnhart***, 455 F.3d 818, 821 (7th Cir. 2006).  However, if the ALJ does not make explicit findings and does not explain them "in a way that affords mean-ingful review," the ALJ's credibility determination is not enti-tled to deference. ***Steele v. Barnhart***, 290 F.3d 936, 942 (7th Cir. 2002).  Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473 F.3d 816, 823 (7th Cir.2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evi-dence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703 (7th Cir. 2004).  If the claimant's impairments reasonably could

produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt,* 395 F.3d at 746-747 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability

29

> to work, the ALJ must obtain detailed
> descriptions of the claimant's daily activi-
> ties by directing specific inquiries about
> the pain and its effects to the claimant.
> She must investigate all avenues presented
> that relate to pain, including claimant's
> prior work record, information and observa-
> tions by treating physicians, examining phy-
> sicians, and third parties. Factors that
> must be considered include the nature and
> intensity of the claimant's pain, precipita-
> tion and aggravating factors, dosage and ef-
> fectiveness of any pain medications, other
> treatment for relief of pain, functional re-
> strictions, and the claimant's daily activi-
> ties. (internal citations omitted).

> *Luna*, 22 F.3d at 691

*See also* ***Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ has discounted the claimant's description of pain because it was inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p at *2. *See **Zurawski***, 245 F.3d at 887; ***Diaz***, 55 F.3d at 307-08 (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." ***Zurawski***, 245 F.3d at 887

(*quoting* **Clifford,** 227 F.3d at 872).  When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See* **Zurawski**, 245 F.3d at 888 (*quoting* **Bauzo v. Bowen**, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Zurawski argues that the ALJ failed to follow *SSR 96-7p* in making a proper credibility determination. Zurawski has pointed to several reasons, including: the ALJ failed to consider reasons for Zurawski's lack of medical treatment; the ALJ incorrectly found that Zurawski failed to cooperate with medical treatment; the ALJ failed to provide a pain analysis or consider limitations in activities of daily living; and the ALJ improperly used boilerplate language when determining Zurawski's credibility.

The court already has addressed the ALJ's failure to consider Zurawski's lack of medical treatment and determined that the ALJ adequately considered Zurawski's justifications for failing to receive treatment.  The ALJ probed into Zurawski's justifications for failing to obtain medical care at the hearing.

Although Zurawski testified that he could not afford to see a doctor or to purchase medications, Zurawski conceded that he had not sought free treatment and did not explain why he did not seek any type of medical treatment for his long-standing impairments during the time he was employed and could afford health care. (Tr. 54) The ALJ was entitled to make an adverse credibility finding when the claimant did not have a good reason for his failure to seek treatment or follow a treatment plan. *Craft*, 539 F.3d at 679.

Furthermore, the ALJ's credibility determination should be assessed as a whole, and this was not the ALJ's sole reason for discrediting Zurawski's testimony.  The ALJ explained that the absence of any medical evidence corroborating Zurawski's testimony was a further indication of his lack of credibility.  *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (Agency will consider the extent to which a claimant's symptoms can reasonably be accepted as consistent with the objective medical and other evidence of record); *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000) ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition.").  The ALJ thoroughly discussed Zurawski's medically determinable physical and mental impairments, as well as the

32

lengthy testimony Zurawski provided describing his limitations
and abilities.  (Tr. 14-17) Although the absence of corroborating
medical evidence may be due in part to Zurawski's failure to
cooperate with medical treatment, the ALJ gave little weight to
this consideration and noted that his decision accounted for
Zurawski's complaints of pain that may not have been reflected in
the medical records.  None of the state agency physicians deter-
mined that Zurawski was unable to work, rather, they found that
he should be limited to light work.  However, the ALJ gave defer-
ence to Zurawski's allegations of pain and determined that he
should be limited to sedentary positions, consistent with Zuraw-
ski's own testimony.  *See* Tr. 50 (Zurawski's testimony stating
that he can sit for 30 to 45 minutes at a time).

Zurawski further asks the court to evaluate whether the ALJ
provided the appropriate pain analysis and considered his limita-
tions in daily living when analyzing Zurawski's credibility.
After a claimant shows the existence of a medical impairment
through objective evidence, the ALJ must question the claimant
about his daily activities and subjective complaints of pain.
*Sparks v. Bowen*, 807 F.2d 616, 618 (7th Cir. 1986); *Bailes v.
Chater*, 1995 WL 743748, *1 (N.D. Ill. 1995); *Clifford*, 227 F.3d
at 871.  The ALJ must conduct more than a cursory investigation.
Taking the objective medical evidence and subjective complaints

of pain under advisement, the ALJ then must articulate whether the claimant's condition reasonably could be expected to produce the pain the claimant alleges.  *Sparks*, 807 F.3d at 618.

Zurawski did not submit objective medical evidence of limitations that would support his allegations of pain.  The medical experts did not find evidence of manipulative, visual, communicative, or environmental limitations, and the ALJ determined that the record did not reflect the existence of a medically determinable impairment that reasonably could be expected to cause the alleged pain.  (Tr. 15, 16) Because there was no objective medical evidence that reasonably could be expected to cause the pain Zurawski alleged to suffer, the ALJ's duty to explore Zurawski's pain and daily activities was not triggered.  *See* SSR 96-7p ("When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities.").

Zurawski argues that the ALJ had a duty to explain his refusal to accept Zurawski's subjective complaints irrespective of the objective medical evidence.  In support of his contention, Zurawski refers the court to *Zurawski*, 245 F.3d at 887.  In

*Zurawski,* the ALJ found that the claimant's complaints of pain were not entirely credible due to the inconsistencies with the objective medical evidence and daily activities.  However, the court faulted the ALJ for not identifying the inconsistencies between Zurawski's daily activities, complaints of pain, and medical evidence.  *Zurawski*, 245 F.3d at 887.  Here, the ALJ explained that the record is devoid of any medical evidence to corroborate his complaints of pain.  The ALJ is not required to perform this analysis when there are no medically determinable physical or mental impairments that could reasonably be expected to produce the symptoms.  SSR 96-7p.  This is not a matter of conflicting evidence.

In any case, if Zurawski could point to objective medical evidence to corroborate his pain, the ALJ engaged in a sufficient exploration of Zurawski's pain and limitations in activities of daily living at the hearing.  The ALJ questioned Zurawski about his limitations, including doing laundry, driving, cleaning, and grocery shopping.  Zurawski was permitted to testify to the aid he received from friends in grocery shopping, his difficulty cleaning the bath tub, and his ability to drive despite his limitations.  The ALJ noted some of the limitations Zurawski testified about in his opinion, including his knee popping out, his unprescribed use of a cane, and his self assessed limitations

35

in walking, carrying, standing, and sitting.  The ALJ further
noted Zurawski's use of over the counter medications, the absence
of supporting evidence for his complaints of depression, and
medical evidence that Zurawski had normal muscle strength and
tone.  The ALJ also stated that even though Zurawski essentially
was blind in the left eye, he still was able to see well enough
out of the right eye to perform basic work-related activities.
(Tr. 16)  The ALJ explained that not only did the record fail to
show the existence of a medically determinable impairment that
could cause the degree of limitations he alleged, but he also
explained that physical examinations did not reveal objective
signs that would show a condition that would prevent Zurawski
from performing at least sedentary work. (Tr. 16). Although the
ALJ did not state every factor relevant to Zurawski's credibility
in his opinion, he was under no obligation to do so. *Diaz*, 55
F.3d at 309.  The ALJ's path of reasoning was abundantly clear in
light of the absence of a medically determinable impairment that
could reasonably be expected to produce the alleged pain.  *See*
*Diaz*, 55 F.3d at 309.  To the extent that the ALJ had any duty to
articulate his reasons for discrediting Zurawski's subjective
complaints in light of the absence of objective medical evidence,
the ALJ fulfilled this obligation by exploring Zurawski's activi-

36

ties at the hearing and by providing a cursory explanation of
Zurawski's subjective complaints in his opinion.

Zurawski's final critique of the ALJ's credibility determi-
nation is that he improperly used boilerplate language. Zurawski
specifically cites to the ALJ's statement that "the claimant's
statement concerning the intensity, persistence and limiting
effects of these symptoms are not credible to the extent they are
inconsistent with the above residual functional capacity assess-
ment."  Although this Circuit disfavors boilerplate language, an
ALJ's decision will not be overturned merely because it contains
a boilerplate statement.  The important assessment is whether the
ALJ adequately supported the boilerplate statement and built a
logical bridge to his conclusion.  Here, the ALJ went forward by
identifying the absence of corroborating medical evidence.  As
discussed above, the ALJ explained the examining physician's
assessments, which determined that Zurawski had normal muscle
tone, could see well from his right eye, did not support Zuraw-
ski's complaints or depression, and found that the claimant could
walk without a cane.  Because the ALJ proceeded to articulate
reasons for his decision, the ALJ's use of boilerplate language
was not improper.

The next issue Zurawski raised was whether the ALJ improp-
erly evaluated Zurawski's RFC under SSR 96-8p.  Zurawski argues

37

that the ALJ failed to explain how he arrived at his RFC finding
and how he evaluated his limitations in daily living. SSR 96-8p
explains how an ALJ should assess a claimant's RFC at steps four
and five of the sequential evaluation.  In a section entitled
"Narrative Discussion Requirements," SSR 96-8p specifically
spells out what is needed in the ALJ's RFC analysis. This section
of the Ruling provides:

> The RFC assessment must include a narrative
> discussion describing how the evidence sup-
> ports each conclusion, citing specific medi-
> cal facts (e.g., laboratory findings) and
> non-medical evidence (e.g., daily activities,
> observations). In assessing RFC, the adjudi-
> cator must discuss the individual's ability
> to perform sustained work activities in an
> ordinary work setting on a regular and con-
> tinuing basis (i.e., 8 hours a day, for 5
> days a week, or an equivalent work schedule),
> and describe the maximum amount of each work-
> related activity the individual can perform
> based on the evidence available in the case
> record. The adjudicator must also explain how
> any material inconsistencies or ambiguities
> in the evidence in the case record were con-
> sidered and resolved. (footnote omitted)
>
> SSR 96-8p

Thus, as explained in this section of the Ruling, there is a dif-
ference between what the ALJ must contemplate and what he must
articulate in his written decision.  "The ALJ is not required to
address every piece of evidence or testimony presented, but he
must provide a 'logical bridge' between the evidence and his

38

conclusions." ***Getch v. Astrue***, 539 F.3d 473, 480 (7th Cir. 2008)
(*quoting **Clifford***, 227 F.3d at 863).

In making his decision, the ALJ stated that he considered
all symptoms and opinion evidence, and the extent to which the
symptoms reasonably could be accepted as consistent with the
objective medical evidence and other evidence.  (Tr. 14) The ALJ
based his decision on the RFC assessment of the state agency
medical advisors because he found that their assessment was well
supported by the objective clinical findings in the record.
Zurawski pointed to several inconsistencies between the state
agency physician's assessment and the ALJ's RFC finding, arguing
that the ALJ's deviation was not accompanied with an explanation
and requires a remand.

The first inconsistency Zurawski cites to is the ALJ's
finding that he could sit for six hours in an eight hour work
day.  Zurawski contends that the medical evidence from Dr. Ibekie
suggested that he had a significant limitation in sitting, stand-
ing, and walking.  Zurawski ignores the fact that the state
agency medical advisers opined that he retained the residual
functional capacity to sit for six hours in a typical work day.
(Tr. 15)  Furthermore, Zurawski's testimony at the hearing sup-
ported the ALJ's conclusion.  Zurawski explained that he sat for
most of the day, could sit for 30 to 45 minutes at a time, and

then needed to get up to stretch for five to 15 minutes.  If Zurawski could sit for 45 minutes every hour, over an eight hour period, by his own admission, he would be capable of sitting for six hours.  Zurawski testified that he propped his legs up when he laid down, but he affirmatively responded that he did not prop his legs up when he sat in a chair.  The ALJ's conclusion was based on substantial evidence of record, including not only the state agency physician's testimony, which the ALJ found to be supported by the medical evidence, but also by Zurawski's own testimony.

Zurawski also argues that the ALJ did not explain why he accepted the state agency doctor's opinion concerning Zurawski's sitting limitation while rejecting his opinion that Zurawski could lift and carry 20 pounds occasionally and ten pounds frequently.  The ALJ stated that Zurawski had the RFC to perform sedentary work as defined by 20 C.F.R. §404.1567(a).  This section defines sedentary work as involving lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  However, the state agency physician determined that Zurawski was capable of lifting a greater amount.

Although the state agency physician and the ALJ's determination are inconsistent, the ALJ explained that Dr. Ibekie noted

that lifting and carrying could be done with difficulty and that Zurawski testified that he could not carry more than ten pounds. The ALJ stated that he viewed the testimony and medical evidence as a whole and that, taken together, the record did not reflect that Zurawski was incapable of performing sedentary work.  (Tr. 16)  Although the state agency physicians determined that Zurawski could carry a heavier load, the ALJ gave deference to the claimant's subjective complaints of pain, unwillingness to proceed with the medical testing, daily activities, and the other objective findings of the physicians.  The ALJ engaged in a thorough analysis of all of this evidence, and it is apparent that the ALJ did not entirely discredit Zurawski's complaints and activities of daily living.  Rather, taking all the evidence into consideration, he determined that the record reflected that Zurawski was at least capable of performing sedentary work, and therefore not disabled.

Zurawski also argues that the ALJ did not explain why the RFC did not encompass his limited range of motion in his shoulders.  The ALJ explained that Dr. Batista tested Zurawski and determined that he had a limited range of motion in both shoulders with a forward elevation and abduction of 100 degrees.  However, Zurawski would not allow a full range of tests due to complaints of pain in his back and hip.  Dr. Ibekie did not opine

that Zurawski was restricted in his ability to move his shoul-
ders.  Although Zurawski complained of pain when lifting his
shoulders, the medical records did not reveal that he was incapa-
ble of such movement.  In any case, Zurawski has not shown how
this error would affect the outcome of his claim.  *See **Keys***, 347
F.3d at 994-95 (explaining that where it is clear that the ALJ's
decision would not be overturned by remanding the issue for
further consideration, the doctrine of harmless error applies to
prevent remand).  When the ALJ asked the VE to consider an indi-
vidual of Zurawski's background who could walk for 15 minutes,
sit for 45 minutes, occasionally lift and carry ten pounds, could
not climb ladders, kneel, squat, touch his toes, or *reach his
arms over his head*, the VE testified that such an individual
remained capable of fulfilling sedentary positions.  Therefore,
to the extent that the ALJ failed to incorporate Zurawski's
inability to reach over his head as part of the RFC, the error
was harmless because Zurawski remained qualified to fulfill
sedentary jobs.

Similarly, none of the doctors determined that Zurawski was
medically depressed, and he did not receive any treatment or
medication to treat depression.  The only evidence of depression
was Zurawski's testimony that he had been feeling depressed
lately.  However, he admitted that he had not sought treatment

42

and was not taking any medication.  The ALJ adequately explained
his reliance on the medical findings of the state agency physi-
cians.  Because the physicians did not identify problems with
depression, it was logical for the ALJ to exclude depression from
his RFC finding.  The ALJ was not required to address every piece
of evidence, particularly evidence that was unsupported by any
medical evidence.

     The final issue Zurawski raised was whether the ALJ's hypo-
thetical questions to the VE failed to account for all of Zuraw-
ski's limitations. Specifically, Zurawski argues the ALJ failed
to ask the vocational expert whether the jobs he identified took
into consideration Zurawski's complaints of his limited ability
to reach over head. However, as previously discussed, in hypo-
thetical question seven, the ALJ directly addressed Zurawski's
inability to reach his arms over his head, along with all of his
other limitations.  (Tr. 69) The VE answered the hypothetical by
stating Zurawski still would be able to perform the suggested
positions of cashier, telemarketer, information clerk, gate
guard, and lobby attendant.

     After his careful consideration of the record and testimony,
the ALJ adopted the residual functional capacity assessment
offered by the state agency medical advisers. In reaching this
determination, the ALJ found Zurawski's allegations were not

credible because the evidence in the record did not show the existence of a medically determinable impairment that could reasonably be expected to cause the degree of limitations Zurawski alleged. It is apparent that the ALJ came to his conclusion after careful consideration of the record, and there is ample support provided in his decision to provide a logical bridge to his final assessment.

_____

For the foregoing reasons, the decision of the Commissioner of Social Security is **AFFIRMED.**

ENTERED this 28th day of September, 2011

s/ ANDREW P. RODOVICH
United States Magistrate Judge

44